UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL LAROY DIGGS,

Plaintiff,

v.

AMY DAVIS, et al.,

Defendants.

Case No. 19-cv-06517-EMC

**ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

Docket No. 92

## I.    INTRODUCTION

Defendants Cindy Black and Amy Davis move for partial summary judgment on Plaintiff Michael Diggs's remaining Fourteenth Amendment equal protection claim.  Defendants argue that no reasonable juror could find that either Defendant personally participated in, directed, or knowingly acquiesced in the alleged sex-based discrimination arising from Mr. Diggs's placement in the Intensive Substance Recovery Unit ("ISRU") — an all-male housing and treatment program at the Napa State Hospital ("DSH-Napa").  Defendants also contend that they are entitled to qualified immunity.

For the reasons set forth below, Defendants' motion is **GRANTED**.

## II.    BACKGROUND

A.    Factual Background

Mr. Diggs was charged in Alameda County Superior Court with murder, with a prior conviction for carjacking.  Dkt. 23-1 at 11.  He was found not guilty by reason of insanity and referred to DSH-Napa for treatment.  *Id.*  Mr. Diggs was housed at DSH-Napa from 2015 until his transfer to Patton State Hospital in 2019.  The relevant events at issue occurred between 2017 and 2019, when Mr. Diggs was housed in the ISRU.  *See* Motion for Partial Summary Judgment ("SJ

Motion") at 2–3 (stating that Mr. Diggs was transferred to the ISRU in early-2017); DiBaise Declaration (Dkt. 119), Ex. 20 (Patient Complaints) at 65, 71, 84 109, 112 (correspondence indicating Mr. Diggs's continued placement in the ISRU throughout 2019).

In addition to suffering from psychiatric disorders including schizophrenia, antisocial personality disorder and PTSD, Mr. Diggs was diagnosed with several substance abuse disorders. SJ Motion at 2. As a result of his substance abuse history, psychiatric disorders, and an incident in which two packets of methamphetamine were mailed to Mr. Diggs, he was placed in the ISRU, which "promotes comprehensive treatment for patients . . . who have co-occurring mental illness and substance dependence or a drug induced psychotic disorder." Dkt. 23 at 34.

The ISRU was created before Mr. Diggs's admission to DSH-Napa, after a clinical staff member was killed in 2010. *See* Opposition to Motion for Partial Summary Judgment ("Opp. to SJ Motion") at 6; DiBaise Decl., Ex. 3 (Dr. Patricia Tyler Deposition) at 55:2–8. During the implementation of a pilot program, it was described as "part of our on-going violence reduction efforts . . . for patients with severe, active problems of substance abuse/dependency." DiBaise Decl., Ex. 18 at 2 (Email re ISRU Pilot). Dr. Patricia Tyler, the former Medical Director at DSH-Napa, confirmed that the ISRU was created in part to address the correlation between aggression and substance use. DiBaise Decl., Ex. 3 (Dr. Tyler Deposition) at 63:2–15. A presentation about substance recovery programs also notes this connection between aggression and substance use. None of these records report a gender-based aspect to substance-induced aggression.

According to Mr. Diggs, the ISRU was markedly more restrictive than other substance recovery units. The record indicates that patients housed in the ISRU were:

- Required or strongly encouraged to attend self-help support groups such as NA and AA meetings. Dkt. 119, DiBaise Decl., Ex. 10 (ISRU Protocol) at 6–7 (listing "[a]ttendance at NA/AA on a regular basis" as part of the "Exit Criteria" for ISRU patients); Ex. 9 (ISRU Advancement Criteria) at 2 (requiring attendance at treatment and recovery group meetings to advance to less restrictive treatment "levels"[1] within ISRU).

---

[1] The ISRU divides patients into three distinct groups or "levels" based on their behavior and compliance with ISRU requirements. *See* Dkt. 119, Ex. 10 (ISRU Protocol). "Level 1" patients

United States District Court
Northern District of California

United States District Court
Northern District of California

- Compelled to undergo more frequent urine drug screenings, including biweekly screenings for "Level 1" (intensive) patients. *Id.* Ex. 10 (ISRU Protocol) at 5; Ex. 24 (Administrative Directive) at 2–3.

- Subjected to coercive measures to punish any patients who refused to complete urine drug screens. *See id.* Ex. 10 (ISRU Protocol) at 6.

- Prohibited from possessing a more inclusive list of "contraband," including certain foods and medications, including Xanax, Wellbutrin, and Ambien. *See id.* Ex. 3 (Dr. Tyler Depo) at 102:3–20; Ex. 12 (Banned Medications List).

- Restricted in their movement through DSH-Napa, with the most intensive "Level 1" patients fully confined to the ISRU unit and prohibited from other units "except for unit sponsored walk groups or visiting center." *Id.* Ex. 10 (ISRU Protocol) at 1–4.  Even less restricted "Level 2" patients were required to sign a contract and submit to "an increase in random urine drug screens" and more frequent body searches to attend off-unit programming with mixed groups, though "socializing with other patients away from the group or using the restroom repeatedly" could lead to removal from the mixed group. *Id.* Ex. 13 (ISRU Off-Unit Protocol) at 1–2.

- Prohibited or limited in their ability to work or attend employment training programs outside the ISRU. *Id.* Ex. 20 (Patient Complaints) at 19, 30, 34.

These restrictive conditions on ISRU patients were not strictly temporary.  Dr. Steward, a psychologist who treated ISRU patients, testified that he could only recall two of his patients "graduating" from the ISRU over the course of his five years treating patients in the program. *See id.* Ex. 6 (Dr. John Steward Deposition) at 20:7–15; *see also id.* Ex. 13 (ISRU Off-Unit Protocol) at 1 (stating that ISRU patients "progress through 3 months in Level 1 prior to becoming eligible for Level 2. . . . Patients must complete 3 months of successful programming on Level 2 . . . in

---

are those actively using substances and who "have not accepted their need for substance recovery despite evidence that this is necessary." *Id.* at 3–4.  "Level One is a 4-month service at minimum." *Id.*  "Level 2" is also a four-month minimum program for patients actively engaged with their treatment program. *Id.*  "Level 3" has no temporal requirements and is designed for patients meeting discharge criteria for the unit. *Id.*

3

order to become eligible for Level 3").

The ISRU houses only male patients admitted by their respective treatment team based on "their individual behavioral needs." Dkt. 92 (SJ Motion) at 3. The ISRU provides services to male patients undergoing substance recovery and psychiatric stabilization. *See id.* Defendants concede that "[o]nly those *male* patients whose treatment team has determined their psychiatric stabilization levels and maladaptive behaviors require a higher level of care for their own safety and the safety of others, are admitted to the ISRU." *Id.* (emphasis added).

DSH-Napa did not evaluate female patients for eligibility in the ISRU. *See* DiBaise Decl., Ex. 1 (Amy Davis Deposition) at 19:20–24. Although the ISRU is all-male, DSH-Napa houses male and female patients, with roughly 20% of its 1,330 total patients identified as female during the relevant period. DiBaise Decl., Ex. 19 (DSH-Napa Demographics) at 1–2. Units at DSH-Napa are divided into "general" and "specialty" units, with units often being co-ed. *See* DiBaise Decl., Ex. 5 (Jennie Leigh Gilmore Clay Deposition) at 24:4–20. There are a few all-male units but they are seemingly limited to housing sex offenders or individuals with acute medical sensitivities. *See id.*

The all-male ISRU is just one residential unit administering the Substance Recovery Program ("SRP") within the hospital. All genders may participate in the SRP, but "any female patient whose psychiatric stabilization levels and maladaptive behaviors required a higher level of care such as is required by those housed on ISRU would receive that level of care, *but in their home residential unit*" rather than in the ISRU or a similarly restrictive equivalent. SJ Motion at 4 (emphasis added); *see also* SJ Motion, Ex. 4 (Supplemental Declaration of Amy Davis) at 2. Put simply, women are not placed into, or even considered for, the ISRU under any circumstances, even if they suffer from substance abuse and psychiatric ailments. *See* SJ Motion, Ex. 4 at 2 (describing the ISRU as "an all male unit" and stating that "[o]nly male patients . . . are admitted to the ISRU unit"). And DSH-Napa does not have an all-female equivalent to the ISRU. *See* SJ Motion at 4; DiBaise Decl., Ex. 5 (Clay Deposition) at 33:15–18.

Defendants contend that the ISRU was not created or operated in a discriminatory manner and that patients of all genders had access to equivalent substance abuse treatment programs

4

through DSH-Napa's SRP.  *See* SJ Motion at 4.  Mr. Diggs contends that non-ISRU treatment programs were not as restrictive as the ISRU, and that Defendants thus "imposed discriminatory barriers on Mr. Diggs and other men . . . without imposing comparable barriers on women."  Opp. to SJ Motion at 9.

Defendants in this action are two DSH-Napa officials: Cindy Black and Amy Davis.  Both defendants held supervisory and program-level responsibilities.

***Cindy Black*** served as the Clinical Administrator for DSH-Napa from 2012–2018, and the Executive Director of DSH-Napa from 2018–2022.  SJ Motion at 2.  Mr. Diggs alleges that, through her roles, Ms. Black was "responsible for approving unit conversions and policies governing substance recovery programs, including the [ISRU]."  Opp. to SJ Motion at 10.  She also allegedly worked with others to ensure that DSH-Napa programs and services complied with applicable federal and state laws, including federal gender discrimination laws.  *Id.* at 10–11 (citing DiBaise Decl., Ex. 2 (Cindy Black Deposition) at 60:9–12; Ex. 7 (Clinical Administrator Position Duties) at 1).  Defendants assert Ms. Black "did not create the ISRU unit" and that she "did not make the clinical decision that Plaintiff be placed in the unit.  Additionally, she did not decide whether Plaintiff could continue or transition from the unit.  This determination was made by his treatment team and program level."  SJ Motion at 9.

***Amy Davis*** served as DSH-Napa's sole Substance Abuse Recovery Coordinator during the relevant period.  DiBaise Decl., Ex. 1 (Amy Davis Deposition) at 13:7–21.  Mr. Diggs alleges that Ms. Davis was involved in "developing and overseeing the ISRU from its inception."  Opp. to SJ Motion at 9.  Mr. Diggs identifies several indications of Ms. Davis's involvement with the ISRU program: a member of the ISRU treatment team testified at their deposition that Ms. Davis as the "overall director" for the ISRU program, Ms. Davis is described in an internal memo as holding "revision responsibility" for administrative directives governing substance recovery services, and she was listed as the primary, and only, contact for patients on the ISRU's brochure.  *Id.* (citing DiBaise Decl., Ex. 6 (Steward Deposition) at 30:22–31:1; Ex. 23 (Administrative Statement) at 1; Ex. 11 (ISRU Pamphlet) at 1).  According to Ms. Davis's own deposition testimony, she was

United States District Court
Northern District of California

5

involved in Mr. Diggs's referral to the ISRU.[2]  DiBaise Decl., Ex. 1 (Davis Deposition) at 28:23–25.  Defendants' motion disputes whether Ms. Davis made the decision to place Mr. Diggs in the ISRU, but Defendants do not object to or even acknowledge Ms. Davis's deposition testimony conceding her involvement in referring Mr. Diggs to the ISRU.  *See* SJ Motion; Dkt. 120 (Reply in Support of SJ Motion).

B.      Procedural History

Mr. Diggs filed this action in 2019, asserting constitutional claims against the California Department of State Hospitals and various DSH-Napa officials arising out of his confinement and treatment.  In September 2021, the Court issued an order denying Mr. Diggs's motion for summary judgment, and in November 2022, the Court denied Defendants' motion for summary judgment.  The parties then entered settlement discussions, and the Court appointed counsel in 2024.  Dkt. 75 (Order Appointing Counsel).

At a March 4, 2025 status conference, the Court clarified the scope of remaining issues in this case.  Dkt. 86 (March 4, 2025 Minute Entry).  The Court ruled that Mr. Diggs's First Amendment claim regarding forced participation in substance recovery meetings was live, as was his gender discrimination claim.  *Id.*  At that status conference, the Court authorized the parties to brief this discrete gender discrimination issue through a motion for partial summary judgment.  *Id.*

Defendants subsequently filed the present motion for partial summary judgment.

### III.      DISCUSSION

Mr. Diggs brings this gender discrimination claim under 42 U.S.C. § 1983, alleging that Defendants Amy Davis and Cindy Black, acting under color of state law, violated his right to equal protection under the Fourteenth Amendment by creating and maintaining the male-only ISRU, placing him in the highly restrictive unit, and not subjecting similarly situated female patients to comparable conditions.

To establish an equal protection violation, Mr. Diggs must show that each individual defendant "acted in a discriminatory manner," that "the discrimination was intentional," and that

---

[2] In response to the question "Were you involved in the referral of Mr. Diggs to the ISRU?" Ms. Davis responded, "I believe so."  DiBaise Decl., Ex. 1 at 28:23–25.

Mr. Diggs's gender was at least a motivating factor in the discrimination. *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000).

The Court must also determine whether Defendants are entitled to qualified immunity as a matter of law.

A.    Gender Discrimination Claim

In evaluating an equal protection claim, the Court first assesses whether the groups being compared are similarly situated, and if so, the Court determines the appropriate level of scrutiny and then applies it. *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018).

***First***, with respect to the similarly situated analysis, the Fourteenth Amendment's Equal Protection Clause requires states to treat similarly situated persons alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Consistent with the parties' submissions, the relevant comparison is between male ISRU-eligible SRP patients and female SRP patients who, based on substance abuse and psychiatric needs, would be candidates for an intensive substance recovery setting but for the ISRU's male-only design. *See* FAC at 9; SJ Motion at 4.

***Second***, sex-based classifications are subject to intermediate scrutiny. Prison and institutional regulations that facially discriminate on the basis of sex are constitutional only if the government demonstrates that they serve important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. *Harrison v. Kernan*, 971 F.3d 1069, 1076 (9th Cir. 2020) (applying intermediate scrutiny in custodial setting); *see also U.S. v. Virginia*, 518 U.S. 515, 516 (1996). The state must offer an "exceedingly persuasive justification" for sex-based distinctions, and may not rely on "overbroad generalizations" or stereotypes about different talents, capacities, or tendencies. *Id.*

Binding Ninth Circuit case law also instructs that custodial officials are afforded deference in managing institutional operations, but that sex-based policies remain subject to heightened scrutiny. *See Harrison*, 971 F.3d at 1077–78; *Ambat v. City & Cnty. of S.F.*, 757 F.3d 1017, 1026 (9th Cir. 2014). Determining the degree of deference owed is a fact-intensive and case-specific inquiry committed to the discretion of the district court. *Ambat*, 757 F.3d at 1026.

United States District Court
Northern District of California

Mr. Diggs alleges, and the record supports, that male SRP participants meeting certain criteria were screened for placement in the ISRU, while female patients with comparable substance-use histories were neither housed in the unit nor evaluated for placement in it.  Opp. to SJ Motion at 1; *see also* SJ Motion, Ex. 4 (Supplemental Declaration of Amy Davis) at 2 ("Any female or transgender patient whose psychiatric stabilization levels and maladaptive behaviors required a higher level of care would receive that level of care, but in their home residential unit.").  Defendants' own motion describes the ISRU as an "all-male unit" that provides "specialized substance treatment for dually-diagnosed individuals" and imposes additional control and restrictions beyond those in standard program units.  *See* SJ Motion at 4, 6.

In view of Ninth Circuit precedent, the Court must afford DSH-Napa administrators a measure of deference.  In doing so, the Court finds it relevant that female patients comprised approximately only 20% of the total DSH-Napa population.  DiBaise Decl., Ex. 5 at 33:9–19.  The Court also considers evidence that DSH-Napa typically establishes a specialized unit only after determining that a sufficiently large cohort — generally around 40 patients — requires the same level of specialized care, and that specialty units are most effective when fully populated.  SJ Motion, Ex. 4 at 2 (Supplemental Declaration of Amy Davis); DiBaise Decl., Ex. 4 (Kleinhenz Deposition) at 55:1–25.  The Court also recognizes DHS-Napa's representations that it housed, and continues to house, a "sufficiently large amount of dually diagnosed male patients who require psychiatric stabilization and an emphasis on maladaptive behavior while enrolled in the" SRP, and that "there was not a sufficiently large number of [female patients] to also require the additional level of care provided in an ISRU to warrant an all-female ISRU."  SJ Motion, Ex. 4 at 2; *see also* DiBaise Decl., Ex. 1 (Davis Declaration) at 61:9–62:5.

On the other hand, there is significant countervailing evidence in the record.  Defendants do not contest that only men were considered for placement in the ISRU.  *See* SJ Motion; Reply in Support of SJ Motion.  With respect to relative population sizes, several specialized units at DSH-Napa operate with populations smaller than the typical 40-patient threshold identified by Defendants, including units housing fewer than 30 patients.  DiBaise Decl., Ex. 2 (Cindy Black Deposition) at 30:8–23.  Moreover, certain specialty units are co-ed or rely on gender-segregated

8

wings, indicating flexibility in unit design beyond the blunt exclusion of entire genders from programs. DiBaise Decl., Ex. 5 (Clay Deposition) at 24:1–14, 33:20–34:6; *see also* DiBaise Decl. Ex. 2 (Black Deposition) at 5:5–9. Most critically, the record reflects no contemporaneous study, survey, or other concrete information-gathering process undertaken to assess the size or needs of a potentially qualifying female patient population before the ISRU was created or during its continued existence. Ms. Davis testified that she did not review any documents or data to support her assertion that the female population was too small to warrant creation of an equivalent unit, and that her declaration on this point was based solely on her memory of patient numbers. *See* DiBaise Decl., Ex. 1 (Amy Davis Deposition) at 61:24–62:8. Ms. Davis further testified that she could not recall any discussion within the Substance Recovery Committee concerning whether there were sufficient numbers of female patients to justify inclusion in the ISRU or creation of a separate unit. *Id.* at 59:3–7. Defendants likewise do not point to any survey, study, or formal assessment conducted prior to or during the ISRU's operation to bolster their population-based justifications.

When faced with decisions that differentiate along gender lines in a prison, prison officials responsible for custodial institutions must be able to justify sex-based distinctions through at least some form of reasoned decisionmaking and not rely on inaccurate assumptions. *See Harrison*, 971 F.3d at 1081 (holding that prison administrators must show that correlative relationships "adequately justify the salient features of a challenged regulation" and may not rely on "traditional, often inaccurate assumptions about gender"); *Ambat*, 757 F.3d at 1026 (requiring evidence that the administrator's judgment was "the product of a reasoned decision-making process, based on available information and experience"); *Robino v. Iranon*, 145 F.3d 1109, 1110 (9th Cir. 1998) (upholding gender-based policy where prison officials conducted a study and grounded their decision in evidence). On the relatively narrow record presented, an argument could be made that DSH-Napa unlawfully filtered male patients into the restrictive ISRU based on general assumptions rather than through a data-informed process or individualized assessments applied across genders. Nonetheless, the Court need not decide the constitutional question here, because as discussed below, Defendants are entitled to qualified immunity, and summary

9

judgment must therefore be **GRANTED** in their favor.

B.      Defendants' Liability and Qualified Immunity

Mr. Diggs contends that Defendants Amy Davis and Cindy Black, acting under color of state law, subjected him to a sex-based classification in violation of the Equal Protection Clause by implementing and maintaining a male-only ISRU that imposed substantially more restrictive conditions on male patients than on similarly situated female patients.  Opp. to SJ Motion at 9. Section 1983 imposes liability on any individual who "subjects, or causes to be subjected" another person to a constitutional deprivation.  42 U.S.C. § 1983; *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  Liability may be established through direct participation or through setting in motion a series of acts that the defendant knew or reasonably should have known would cause a constitutional violation.  *See Duffy*, 588 F.2d at 743–44.

These principles apply to supervisory officials too.  A supervisor may be held liable if they personally participate in the unconstitutional violation or if there is a sufficient causal connection between the supervisor's conduct and the violation, including where the supervisor knowingly approves or fails to correct a constitutionally deficient policy.  *Keates*, 883 F.3d at 1242–43; *Starr v. Baca*, 652 F.3d 1202, 1207–12 (9th Cir. 2011); *Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 798–802 (9th Cir. 2018).  There is no respondeat superior liability under § 1983, *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018).

The record includes evidence that Ms. Davis was involved in Mr. Diggs's referral to the ISRU, served as the program's overall director, and held administrative responsibility for substance-recovery services, including revision responsibility for directives governing the ISRU. *See* DiBaise Decl., Ex. 1 at 28:23–25 (Ms. Davis's deposition testimony stating that she was involved in referring Mr. Diggs to the ISRU); DiBaise Decl., Ex. 6 at 30:22–31:1; Ex. 23 at 1; Ex. 25 at 2–3.  She was also identified as the sole contact for ISRU patients.  DiBaise Decl., Ex. 11.

Mr. Diggs has also produced evidence that Ms. Black approved or oversaw policies governing the ISRU while it operated as a male-only unit, and that she possessed authority over unit conversions, administrative directives, and compliance with applicable state and federal law. Opp. to SJ Motion at 6, 9, 11; DiBaise Decl., Ex. 2 at 60:9–12, 201:23–202:9, 202:21–203:8; Ex.

United States District Court
Northern District of California

7 at 1–2; Ex. 20 at 9–14, 21, 32–34, 39, 46–49.

Accordingly, the individual defendants may be held responsible for the alleged constitutional violation.  Despite Defendants' involvement in creating or maintaining the ISRU, however, Defendants are entitled to qualified immunity.

Qualified immunity shields officials from civil damages liability unless (1) the facts show the official violated a constitutional right, and (2) the right was clearly established at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018).  "[F]or a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *White v. Pauly*, 580 U.S. 73, 79 (2017).  Where, as here, qualified immunity is raised at summary judgment, the Court must draw all reasonable inferences in the non-movant's favor.  *See Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).

As discussed above, Mr. Diggs has presented a fair argument that Defendants subjected him to a sex-based classification that imposed materially more restrictive custodial conditions on male patients relative to similarly situated female patients.  But the Court rules that the constitutional right at issue under the circumstances of this case was not clearly established at the time of the challenged conduct such that any reasonable official would be aware of the unlawfulness of Defendants' acts.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *White*, 580 U.S. at 79; *Hernandez*, 897 F.3d at 1132.

Although it had been established by binding precedent that government programs in prisons may not allocate benefits or burdens based on archaic or overbroad generalizations about the relative capacities or tendencies of the genders or mere administrative convenience alone, it is not clear from the record that the ISRU's male-only composition would be manifestly unlawful to a reasonable DSH-Napa administrator.  *See Califano v. Goldfarb*, 430 U.S. 199, 206–07 (1977); *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 730 (2003); *Blake v. City of L.A.*, 595 F.2d 1367, 1376 (9th Cir. 1979).  In so holding the Court assumes that circuit precedent may clearly establish a legal principle under the doctrine of qualified immunity even where the Supreme Court has remained silent.  *See, e.g.*, *Evans v. Skolnik*, 997 F.3d 1060, 1066 (9th Cir. 2021) (holding that a

right may be clearly established "by decisional authority of the Supreme Court or this Circuit" or "decisions of state courts, other circuits, and district courts"); *Meyers v. Pope*, 303 F. App'x 513, 516 (9th Cir. 2008) (holding that the obligation to detain individuals in non-punitive conditions was clearly established based on a prior Ninth Circuit decision).

As noted above, by at least 2014, some Ninth Circuit authority suggested that custodial officials, while afforded deference in institutional management, could not rely solely on generalized assumptions when adopting sex-based policies. Instead, such officials were required to ground sex-based policies in some form of reasoned decisionmaking rather than generalized assumptions or archaic stereotypes, or post hoc rationalizations. *See, e.g.*, *Ambat v. City & Cnty. of S.F.*, 757 F.3d 1017, 1026–27 (9th Cir. 2014) (upholding policy prohibiting male deputies from supervising female inmates, but also holding that deference to custodial officials "is not automatic" and that officials must be able to demonstrate that the policy was "the product of a reasoned decision-making process, based on available information and experience") (quoting *Torres v. Wisc. Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1532 (7th Cir. 1988)); *Robino v. Iranon*, 145 F.3d 1109, 1110–11 (9th Cir. 1998) (upholding similar policy after a prison task force conducted a study and determined the policy was the "best policy to protect female inmates"); *see also Califano*, 430 U.S. at 206–07; *U.S. v. Virginia*, 518 U.S. at 516.

However, pre-2020 authorities did not clearly define what showing custodial officials were required to make in order to justify a gender-based program under the Fourteenth Amendment. *See id.*; *Goldyn v. Angelone*, 1999 WL 728561, at *2 (9th Cir. Sept. 16, 1999) (stating that prison's sex-based policy required an "exceedingly persuasive justification" without establishing guidelines or standards for prison administrators to follow); *Laing v. Gusto*, 92 F. App'x 422, 423–44 (9th Cir. 2004) (hinting at the application of intermediate scrutiny in the correctional context but ruling in jail's favor and not explaining the specific requirements for custodial officials to follow); *Byrd v. Maricopa*, 629 F.3d 1135 (9th Cir. 2011) (same).

In particular, no binding authority mandated that officials conduct a formal study, collect or analyze particular categories of demographic or clinical data, or evaluate cross-gender placement alternatives before implementing a housing program that is all-male. It was not clearly

12

established that it was unconstitutional to rely not on archaic stereotypes and assumptions, but on a perception as to the practicality of implementing a coed program involving inmates that present substantial challenges (substance abuse plus behavioral issues) or the lack of sufficient numbers of women suitable for a gender exclusive program for troubled inmates.  No precedent had held at the time that a formal study and quantitative analysis must be performed.  While it may be argued that an administrative determination based on professional judgment and experience without a close examination of data is constitutionally insufficient to uphold gender discrimination, the law on this point was not clearly established.   Nor did controlling precedent more generally explain how courts should balance institutional deference against the "exceedingly persuasive justification" requirement in the context of prison or custodial treatment units.

To be sure, the Ninth Circuit subsequently touched these issues in *Harrison v. Kernan*, 971 F.3d 1069 (9th Cir. 2020), which confirmed that intermediate scrutiny applies to sex-based distinctions in correctional settings and emphasized that such institutions may not merely rely on generalized empirical correlations between gender and behavior.  *Id.* at 1078–81 (holding that "gender-based distinctions must be rooted in reasoned analysis by policymakers, rather than the mechanical application of traditional, often inaccurate assumptions about gender" and remanding so that the California Department of Corrections could submit "more data" in support of its sex-based policy).  To the extent *Harrison* shed more light upon the applicable legal standard, however, Mr. Diggs had been removed from the ISRU and transferred to a different institution entirely.

In sum, it cannot be said that existing precedent placed the constitutional question here "beyond debate."  *White*, 580 U.S. at 79.  Even viewing the record in the light most favorable to Mr. Diggs, a reasonable DSH-Napa administrator could have understood the governing law to permit reliance on institutional experience and professional judgment about management and safety when structuring specialized treatment units — without conducting a deeper analysis.  Defendants are therefore entitled to qualified immunity.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** summary judgment on Defendants' claim

of entitlement to qualified immunity and **DISMISSES** Mr. Diggs's claim of gender discrimination.

       **IT IS SO ORDERED**.

Dated: February 11, 2026

_____
EDWARD M. CHEN
United States District Judge